IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Martin Bednar,<br>*as executor of The Estate of Stella J. Bednar,*<br>*Plaintiff*<br><br>v.<br><br>Dr. Abel Donka,<br>StoneRidge Senior Care, LLC d/b/a Avalon Health Center, *and*<br>Yale New Haven Health Services Corporation d/b/a Westerly Hospital<br>*Defendants* | Case No. 3:22-CV-00875<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1) Stella J. Bednar was 84 years old when she passed away on October 30th, 2020, after having been in the care of Dr. Abel Donka (hereafter, "Dr. Donka") at Avalon Health Center (hereafter, "Avalon") in Mystic, CT, followed by Westerly Hospital in Westerly, RI.

2) While 84 years is no short lifespan, Mrs. Bednar did not die of old age; she died from complications of imprudent treatments prescribed by Dr. Donka, followed by third-world level treatment at Westerly Hospital that, in addition to causing an early death, also caused substantial pain and suffering.

3) The care received at Westerly Hospital was beneath the standards provided by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and was apparently motivated by their belief that Mrs. Bednar had reached "her time" and should be transferred to hospice to die rather than continue to use the hospital's resources.

4) Dr. Donka's care at Avalon Health Center constituted medical malpractice, as did Westerly Hospital's care, for which Mrs. Bednar's estate (hereafter, "The Estate") hereby also seeks to recover damages in wrongful death.

## JURY TRIAL

5) The Estate demands a trial by jury on all issues so triable.

## PARTIES

6) Plaintiff is the estate of a deceased natural person last residing in North Stonington, CT.

7) Defendant Dr. Abel Donka is a licensed physician who, relevant to this case, practiced medicine in Mystic, CT.

8) Defendant StoneRidge Senior Care, LLC d/b/a Avalon Health Center is a Florida limited liability company, with, relevant to this case, a location in Mystic, CT.

9) Defendant Yale New Haven Health Services Corporation d/b/a Westerly Hospital is a Connecticut corporation with, relevant to this case, a location in Westerly, RI.

## JURISDICTION & VENUE

10) Federal question subject matter jurisdiction is provided by 42 U.S.C. § 1395dd(d)(2).

11) Supplemental jurisdiction is proper under 28 U.S.C. § 1367 over all remaining claims, which arise out of the same case and controversy.

12) Personal jurisdiction is proper because all defendants reside or work within the state in which this district court is situated.

13) Venue is proper because part of the incident that gave rise to the complaint occurred within this district and because it is likely the only district in which personal jurisdiction is possible over all defendants.

### CONN. GEN. STAT. § 52-190a CERTIFICATION

14) The undersigned counsel certifies that a reasonable inquiry was conducted as to the merits of the negligence claims against the health care provider defendants sued herein and that this action was brought in good faith following the written opinion of a similar health care provider that grounds exists for those claims, in accordance with Conn. Gen. Stat. § 52-190a. The certificate, as redacted pursuant to § 52-190a, is attached as Exhibit A.

### ALLEGATIONS OF FACT

15) In mid-2020, Mrs. Bednar was admitted to a hospital for complications relating to a urinary tract infection, atrial fibrillation, diabetes, and other ailments common in individuals of her age of 84 years old.

16) After she was stabilized, she was transferred by the hospital to Avalon Health Center, which bills itself on its Web site as "an intimate, healing environment for older adults who require post-acute care and rehabilitation, or long-term care for a chronic condition," on August 25th, 2020.

17) On that date, she did not have any imminently life-threatening conditions, nor did she have any terminal conditions.

18) On that date, she was able to feed herself, to use the bathroom without assistance, and to walk using a walker.

19) On that date, and at all times discussed in the complaint, Mrs. Bednar was mentally sharp, showing no signs of dementia or other inability to understand where she was, express her needs, recognize and converse with her loved ones, and so forth.

20) Avalon employed Dr. Donka as the primary physician treating its residents, including Mrs. Bednar, and was the only doctor tasked with Mrs. Bednar's care.

21) Dr. Donka did not work at Avalon full-time, but rather visited on occasion or as-needed.

22) Despite Dr. Donka's limited presence at Avalon, he pursued an aggressive regimen of treatments for Mrs. Bednar.

23) Among those treatments were diuretics, or "water pills," known as Lasix (furosemide), which Dr. Donka prescribed first, and Zaroxolyn (metolazone), which was added to Lasix later.

24) Dr. Donka prescribed water pills to reduce water retention and swelling that was troubling Mrs. Bednar.

25) However, both Lasix and Zaroxolyn have a well-known and very common side-effect: a reduction in potassium in the blood ("hypokalemia," when clinically-significant).

26) There exists a sub-class of other diuretics that Dr. Donka could have chosen that do not have a likelihood of acute, critically-low blood potassium, known as "potassium-sparing diuretics," at least five of which are FDA-approved for the same purpose, but Dr. Donka did not use any of these.

27) Mrs. Bednar's potassium was already slightly low when she was admitted to Avalon, with a lab report for the same date showing a level of 3.4 mmol/L.

28) The commonly accepted minimum for "normal" potassium is 3.5 mmol/L.

29) Mrs. Bednar also regularly took insulin to control diabetes.

30) Insulin administration is a risk factor for low potassium.

31) Mrs. Bednar also regularly took prednisone, a corticosteroid, to control an autoimmune issue.

32) The FDA label for Zaroxolyn states: "The risk of hypokalemia is increased ... when corticosteroids are given concomitantly..."

33) To recap: Dr. Donka prescribed:

    a. two non-potassium-sparing diuretics simultaneously,

    b. for use on an elderly woman,

    c. who already had low blood potassium,

    d. who was taking insulin,

    e. who was taking a corticosteroid.

34) No reasonable, competent medical professional would have pursued this course of treatment under the circumstances described due to the risk of hypokalemia.

35) In fact, under these circumstances, it would have been more surprising if Mrs. Bednar's potassium did *not* drop below acceptable levels.

36) Further, in patients that are aggressively treated with water pills, and especially those with *five risk factors for hypokalemia*, constant monitoring of potassium levels is required if the drugs are to be used at all.

37) Predictably, 3 weeks after Dr. Donka began prescribing the first diuretic, and days after adding the second, Mrs. Bednar's potassium level plummeted, and on September 18th, 2020, a blood test revealed that it had dropped to 2.2 mmol/L.

38) The lab report described this level as "critical" and laboratory staff required verbal confirmation from Avalon staff that they had read and understood the potassium level.

39) That characterization of "critical" was correct: a blood potassium level of 2.2 mmol/L is potentially acutely fatal.

40) Dr. Donka's response to the lab report on September 18th, 2020, was to "temporarily" discontinue the Lasix, without discontinuing the Zaroxolyn, to prescribe oral potassium, and to check back in the next day.

41) Dr. Donka did not check her potassium levels again for 3 more days.

42) This response is shockingly inadequate and no reasonable, competent medical professional would have done the same.

43) Mrs. Bednar should have been urgently brought to a hospital to administer intravenous potassium, all water pills should have been immediately discontinued, and she should have been constantly monitored (including at least daily checks of blood potassium levels).

44) Mrs. Bednar did not immediately die from the low potassium, but she experienced severe well-known effects of the same: muscle pain, partial paralysis, blurred vision (due to her eye muscles experience that paralysis), and extreme weakness.

45) After approximately September 18th, 2020, Mrs. Bednar was unable to feed herself, or use the bathroom without substantial assistance, and was never able to walk using a walker (or otherwise) again.

46) A few days before September 18th, 2020, Mrs. Bednar's family communicated with her via a "Zoom" video call where she was up and about in one of the recreation areas of Avalon.

47) A few days after September 18th, 2020, Mrs. Bednar's family communicated with her via Zoom again, only to notice that she was in her bed in her room, unable to get up, and suffering from the symptoms described *supra*.

48) Avalon made no proactive attempt to reach out to the family to notify them of the critically-low potassium levels or her deterioration, despite having a valid power-of-attorney on file naming Mrs. Bednar's son – a physician himself – to make decisions for her medical care.

49) Mrs. Bednar's son called Dr. Donka to demand an explanation for the deterioration of her condition and was told that her potassium was "a little low."

50) Upon being pressed for an exact number, the 2.2 mmol/L reading was conveyed to him.

51) Recognizing, as any doctor would, that 2.2 mmol/L was not "a little" anything, Mrs. Bednar's son insisted that she be transferred to a hospital.

52) On September 24th, 2020, Mrs. Bednar was transferred to Westerly Hospital.

53) Unfortunately, her care did not substantially improve at Westerly Hospital.

54) The attitude of the staff at Westerly Hospital was that Mrs. Bednar was old and should be transferred to hospice and allowed to die.

55) This attitude was not "subtle" or subject to misinterpretation: Mrs. Bednar's family was repeatedly pressured to allow her to be transferred to hospice.

56) But, only a week prior, Mrs. Bednar was showing no signs of any life-threatening or terminal illnesses, and although the potassium level was life-threatening, there was no evidence that it was necessarily terminal and therefore treatment was both possible and appropriate.

57) Medical staff was rotated so frequently that Mrs. Bednar rarely saw the same doctors twice, leading to minimal and deleterious continuity of care.

58) The new doctors appeared ill-informed as to Mrs. Bednar's history of illness and treatment.

59) Perhaps due to their "she's old, it's her time" attitude, or perhaps due to their quick rotation/low information transfer routine, Westerly Hospital made several "mistakes."

60) First, her pain medication was often delivered to her late; that is, despite being prescribed for administration at a certain time, it was often not delivered at or near that time.

61) Second, a Westerly Hospital doctor mistakenly reduced her dosage of the corticosteroid Mrs. Bednar had taken for years by 50% when it should not have been reduced at all.

62) When one is taking corticosteroids, it is critically important that if they are discontinued, they are "tampered" (discontinued slowly by reducing dose over time), because oral steroids suppress the body's natural production of steroids, and that natural production may take weeks to ramp up as oral steroids are discontinued.

63) The symptoms of rapid reduction of oral steroid dose include severe fatigue, weakness, body aches, joint pain, nausea, loss of appetite, and lightheadedness.

64) In other words, Westerly Hospital now greatly amplified the symptoms she was already having from the low potassium incident, resulting in additional co-morbid sequelae such as infections.

65) Third, it became clear that Mrs. Bednar was suffering from depression, as one may expect for someone who is bedridden and in constant pain, and expressed at some points that she wanted to die (although at other points, when surrounded by loved ones, would reaffirm her desire to live).

66) One Westerly Hospital doctor noted in her chart that she had symptoms of "major depression."

67) But despite a diagnosis (or at least a notation of symptoms), Westerly Hospital did little, if anything, to treat her depression, with staff having the attitude that an older person in her condition wanting to die was normal, and, perhaps, rational.

68) Fourth, now that she was unable to feed herself and had reduced appetite, she relied on the hospital staff to feed her.

69) But, nurses would rarely spend more than a few minutes giving her more than a few bites of pudding or other soft foods, simply documenting that she didn't want to eat any more.

70) One doctor even labeled her as having "anorexia."

71) Obviously, Mrs. Bednar was not watching her figure, and anorexia is not a proper diagnosis for a patient that is getting poor nutrition due to being unable to feed herself, having medically-induced loss of appetite, being in constant pain, and having nurses who put little care into attempting to feed her.

72) It shortly became clear that Mrs. Bednar would require another means of nutrition if she was not to die of starvation.

73) Mrs. Bednar should have been treated with a "PICC line," which is used to provide intravenous nutrition.

74) But when a PICC line was finally ordered, there was a 4-day delay in scheduling the procedure, at which point Westerly Hospital staff said that they attempted, but were unable, to insert the PICC line.

75) It is highly unusual for competent medical staff to be unable to insert a PICC line.

76) And, it turned out, that was the last PICC line that Westerly Hospital had available to use for Mrs. Bednar, or at least that is what Mrs. Bednar's family was told.

77) Westerly Hospital also claimed that it could not rapidly obtain any from neighboring hospitals or any other distributor.

78) A PICC line is an extraordinarily common, inexpensive, and easy-to-use piece of equipment that is basically just a fancy tubing set.



*Image 1 – A common "Peripherally Inserted Central Catheter" (PICC) line kit.*

79) At the time, Westerly Hospital was not facing a surge of coronavirus patients or other unusual load – they simply but absurdly failed to have basic life-saving equipment on hand or did not care to "waste it" on an elderly patient they deemed undeserving.

80) Ultimately, it became clear that Westerly Hospital had not, and apparently could not, stabilize Mrs. Bednar's symptoms, despite most or all of them being quite treatable using common and relatively non-invasive and inexpensive treatments.

81) In other words, Mrs. Bednar got worse when many or all of her symptoms could have gotten better with adequate care.

82) Mrs. Bednar spent 20 days needlessly deteriorating and suffering in Westerly Hospital.

83) Mrs. Bednar was thereafter transferred to another hospital on October 14th, 2020.

84) The new hospital had no trouble obtaining and inserting a PICC line on first attempt and promptly restored her nutrition intake.

85) Unfortunately, Mrs. Bednar's body was not able to recover from the combination of Dr. Donka's reckless medication and Westerly Hospital's failure to bring her back to baseline, and she passed away on October 30th, 2020.

## CLAIMS FOR RELIEF

### Count 1 – Violation of EMTALA
### *Against Westerly Hospital*

86) Mrs. Bednar arrived at Westerly Hospital with an emergency medical condition requiring urgent attention.

87) Westerly Hospital was required by federal law to provide appropriate treatment to stabilize her condition.

88) Instead, Westerly Hospital declined to provide normal treatments, preferring instead to pass her off to hospice, and made substantial mistakes in the few treatments it attempted, making Mrs. Bednar's condition worse rather than stabilizing her.

89) By delaying medications, accidentally reducing medications, failing to meaningfully treat depression, failing to have and know how to use common life-saving equipment, neglecting her need to be fed, and by proceeding with an attitude that Mrs. Bednar's life was close enough to having reached the end of her time, Westerly Hospital admitted a patient who could have been saved and discharged a patient who could not.

90) Even if, on admission, Mrs. Bednar was destined to eventually succumb to her injuries caused by the potassium drop no matter what treatment she received, Westerly Hospital could have both extended the amount of time she had and reduced the pain and suffering she endured.

91) The Estate therefore brings a claim under 42 U.S.C. § 1395dd(d)(2) for her wrongful death and the pain and suffering caused.

## Count 2 – Wrongful Death via Medical Malpractice
### *Against Westerly Hospital*

92) Yale New Haven Health Services Corporation d/b/a Westerly Hospital, via its employees and agents, had a duty to care for Mrs. Bednar as a reasonably prudent doctor would have given the facts at hand.

93) Westerly Hospital breached this duty by the means described in ¶ 89, *supra*.

94) Mrs. Bednar ultimately died from the combination of this breach as well as Dr. Donka's negligence, and endured substantial avoidable pain and suffering.

95) Mrs. Bednar would not have died in 2020 had Westerly Hospital appropriately treated her conditions and monitored her treatments.

96) The Estate therefore brings a claim for her wrongful death and the pain and suffering caused.

## Counts 3 and 4 – Wrongful Death via Medical Malpractice
### *Against Dr. Donka (Count 3) & Avalon Health Center (Count 4)*

97) Dr. Donka had a duty to care for Mrs. Bednar as a reasonably prudent doctor would have given the facts at hand.

98) Dr. Donka breached this duty by disregarding the known risks of the treatment he prescribed to Mrs. Bednar by: 1) selecting a potentially dangerous drug combination, 2) failing to monitor for that danger, and 3) failing to sufficiently mitigate the danger when it occurred.

99) StoneRidge Senior Care, LLC d/b/a Avalon Health Center is liable for the torts of its employees and agents under the doctrine of *respondeat superior*.

100) Dr. Donka at all times relevant was acting as an employee or agent of Avalon Health Center.

101) Mrs. Bednar ultimately died from the combination of this breach as well as Westerly Hospital's negligence, and endured substantial avoidable pain and suffering.

102) Mrs. Bednar would not have died in 2020 had Dr. Donka appropriately treated her conditions and monitored his treatments.

103) The Estate therefore brings a claim for her wrongful death and the pain and suffering caused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

i. Actual damages for wrongful death, pain, and suffering in an amount to be determined by a jury.

ii. Punitive damages for the same in an amount to be determined by a jury.

iii. Cost of the action.

iv. Reasonable attorney's fees.

v. Pre- and post-judgment interest as allowed by law.

vi. Any other such relief as the Court deems appropriate.

Dated: Hartford, CT                    Respectfully submitted,

July 12th, 2022                         */s/ ct21994*
                                        _____
                                        Daniel J. Krisch, Esq.
                                        Halloran & Sage LLP
                                        CT Bar #ct21994
                                        One Goodwin Square, 225 Asylum Street
                                        Hartford, CT 06103
                                        E-mail: krisch@halloransage.com
                                        Phone: (860) 297-4630

                                        */s/Jonathan Corbett*
                                        _____
                                        Jonathan Corbett, Esq.
                                        CORBETT RIGHTS, P.C.
                                        CA Bar #325608 (*pro hac vice* pending)
                                        958 N. Western Ave. #765
                                        Hollywood, CA 90029
                                        E-mail: jon@corbettrights.com
                                        Phone: (310) 684-3870
                                        FAX:   (310) 675-7080

                                        *Attorney for Plaintiff*

7651167v.1